FILED
2020 Oct-21  PM 12:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE NOTHERN DISTRICT OF ALABAMA MIDDLE DIVISION

|  |  |  |
|---|---|---|
| **REGINALD SANDRIDGE,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **4:19-CV-943-KOB** |
| **ANDREW SAUL,** | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

## MEMORANDUM OPINION

## I.  INTRODUCTION

On January 11, 2016, the claimant, Reginald Sandridge, protectively applied for disability and disability insurance benefits under Titles II and XVI of the Social Security Act. (R. 174-183). The claimant initially alleged disability beginning on December 31, 2012, because of cervical degenerative disc disease, degenerative joint disease, and osteoarthritis of the left hip. The Commissioner denied the claim on March 23, 2016. (R. 72-81). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on March 20, 2018. (R. 30-56, 106-107).

In a decision dated May 29, 2018, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, therefore, was ineligible for social security benefits. (R. 24). On May 8, 2019, the Appeals Council denied the claimant's request for review.  (R 1-6).

Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 16). The claimant has exhausted his administrative remedies,

1

and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons

stated below, this court REVERSES and REMANDS the Commissioner's decision to the ALJ.

## II.   ISSUE PRESENTED

Whether the ALJ's finding that the claimant's subjective allegations regarding the
intensity, persistence, and limiting effects of his hip pain are inconsistent with the medical
evidence lacks substantial evidence in the record.

## III.   STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must

affirm the Commissioner's decision if the Commissioner applied the correct legal standards and

if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v.*

*Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.

1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims." *Walker*, 826

F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*.

The court will affirm those factual determinations that are supported by substantial

evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

402 U.S. 389, 401 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the

nature and extent of a claimant's residual functional capacity, and the application of vocational

factors, "are not medical opinions,...but are, instead, opinions on issues reserved to the

Commissioner because they are administrative findings that are dispositive of a case; i.e., that

would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d).

Whether the claimant meets the listing and is qualified for Social Security disability benefits is a

2

question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV.   LEGAL STANDARD

A claimant may establish that he has a disability thorough his "'own testimony of pain and other subjective symptoms.'" *Tredik v. Comm'r Soc. Sec.*, No. 19-14606, 2020 WL 5496290 *5 (11th Cir. September 11, 2020) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). When a claimant attempts to establish disability through his own testimony concerning pain or other subjective symptoms, he must show "(1) evidence of an underlying medical condition, and (2) *either* (A) objective medical evidence that confirms the severity of the alleged pain stemming from the condition, *or* (B) that the objectively determined medical condition is so severe that it can reasonably be expected to cause the alleged pain." *Tredik*, 2020 WL 5496290 at *5 (citing *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (emphasis added).

"'After considering a claimant's complaints of pain, the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence.'" *Tredik*, 2020 WL 5496290 at *5 (quoting *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992)). The ALJ must

3

"explicitly and adequately articulate his reasons if he discredits subjective testimony." *Tredik*, 2020 WL 5496290 at \*5 (quoting *Marbury*, 957 F.2d at 839). When evaluating the claimant's subjective complaints, the ALJ must consider: (1) the claimant's daily activities; (2) the nature and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, and effects of medications; and (5) treatment or measure taken by the claimant for relief of symptoms. *Tredik*, 2020 WL 5496290 at \*5 (citing 20 C.F.R. § 404.1529(c)(3)).

Also, substantial evidence must support the ALJ's findings regarding the limiting effects of the claimant's symptoms. *Meehan v. Comm'r of Soc. Sec.*, No. 18-14924, 2019 WL 2417642, at \*3 (11th Cir. Jun. 10, 2019); *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987). Therefore, the ALJ's determination "must contain explicit reasons for the weight given to a claimant's individual symptoms, be consistent with and supported by the evidence, and be clearly articulated so the claimant and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. A reviewing court will not disturb a clearly articulated credibility finding that has supporting substantial evidence in the record. *Rose v. Berryhill*, No. 6:18-cv-00030-LCB, 2019 WL 2514936, at \*9 (N.D. Ala. Jun. 18, 2019) (citing *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995)).

## V.  FACTS

The claimant was thirty-five years old at the time of the ALJ's final decision. He has a high school education and past relevant work as a caregiver, glass cutter, quality inspector, and chicken sorter. He alleges disability based on cervical degenerative disc disease, degenerative joint disease, and osteoarthritis of the left hip. (R. 30-55, 206).

*Physical Impairments*

On February 24, 1997, the claimant sought treatment at Northeast Orthopedic Clinic (NEO) for consistent left hip pain for the prior five or six months. Dr. George Douthit, the

4

claimant's treating physician, noted that the claimant had good symmetrical range of motion of

the hip; had a slight limp but walks fine; could play basketball and football; and could jump up

and down. Additionally, Dr. Douthit found nothing obviously wrong on the x-rays, and

recommended physical therapy and soft tissue therapy to help relieve the claimant's pain. (R.

380).

Two years later, on October 21, 1999, the claimant returned to NEO complaining again of

left hip pain. This time orthopedic specialist Dr. Daniel Ryan evaluated the claimant. The

claimant reported to Dr. Ryan that his hip had bothered him for three years and recently

worsened with more aggravating and constant pain. Dr. Ryan noted the claimant's pain with

internal and external rotation; good range of motion despite pain with full flexion; evidence of

avascular necrosis; and evidence of osteoarthritis of the left hip. Dr. Ryan did not recommend

restricting the claimant's activity, but prescribed a Decadron Dosepak and Lodine for

inflammation and further physical therapy for stretching and range of motion if the claimant did

not improve. (R. 381).

On December 7, 1999, the claimant followed-up with Dr. Ryan and reported having less

pain taking his Lodine twice a day. Dr. Ryan noted that the x-rays showed no real change since

the claimant's last films and recommended that the claimant continue full normal activity and

return in six months for new x-rays. (R. 382).

On October 4, 2001, the claimant returned to NEO and saw Dr. Douthit for left hip pain.

The claimant reported an increase in his pain after he fell playing basketball. X-rays showed

further advancement of the claimant's avascular necrosis disease. Specifically, the claimant

appeared "to have a component of avascular necrosis of the left femoral head probably secondary

to delayed Perthes disease as a child." Additionally, Dr. Douthit noted that the claimant's

symptoms likely will not improve and result in the claimant needing a hip replacement. Dr.

5

Douthit recommended Celebrex, a nonsteroidal anti-inflammatory drug, and a change in the claimant's lifestyle. (R. 383).

The claimant returned to NEO on November 1, 2001, and reported that he had curtailed his activities, took his Celebrex, and was doing well. Dr. Douthit diagnosed the claimant with avascular necrosis of his hip. At a follow-up on December 1, 2001, the claimant again reported doing well taking his Celebrex. (R. 384-385).

Two years later, on October 17, 2003, the claimant saw Dr. Ryan at NEO again for complaints of right hip pain. The claimant reported worse pain because the Celebrex was no longer effective. Dr. Ryan noted that the claimant's avascular necrosis showed no further collapse of the femoral head, but the joint space had narrowed; his hip had zero internal rotation and fifteen degrees external rotation when flexed beyond ninety degrees; and his hip could not internally rotate to neutral. Dr. Ryan prescribed the anti-inflammatory drug Bextra and told the claimant to follow up with him in two weeks. Dr. Ryan also noted that the claimant was a candidate for hip replacement but, recommended treating the claimant conservatively for as long as possible. (R. 386).

The claimant returned to NEO on January 28, 2004 for a follow-up appointment. Dr. Douthit reiterated that the claimant has avascular necrosis and would need a hip replacement at some point. Dr. Douthit additionally noted that the claimant should return for treatment on an as-needed basis and continued his prescription for Bextra.  (R. 387).

On August 9, 2008, the claimant injured his neck in a motor vehicle accident. At the scene, the responders placed the claimant in a C-collar and transported him to Gadsden Regional Medical Center's emergency room.[1] At the hospital, Dr. Stephen Jones treated him for neck pain.

---

[1] Much of this report is illegible.

The claimant's x-rays showed no evidence of fracture or dislocation. When physically examining the claimant, Dr. Jones found that the claimant's neck had a mild spasm of the paracervical musculature bilaterally, with minimal tenderness to palpation. Additionally, Dr. Jones opined that the claimant suffered from an acute cervical strain; prescribed the claimant 10 milligrams of Flexeril for muscle spasms, 500 milligrams of Naprosyn for pain, and 100 milligrams of Darvocet for pain; and discharged him that same day. (R. 348-351, 354).

Subsequently, on December 19, 2008, the claimant sought treatment at Quality of Life with Dr. James McCain for hip pain and numbness in his hands and feet. The claimant reported his pain level as a ten out of ten on the pain scale.[2] (R. 397).

On January 2, 2009, the claimant saw Dr. Stephen Jones at Gadsden Regional Medical Center complaining of numbness and tingling in his right and left arms with the onset of symptoms three weeks prior; a pain level of nine out of ten; and a gradual onset of his intermittent symptoms, which became progressively worse. Dr. Jones's physical examination indicated no tenderness of the claimant's neck; no spinal tenderness; and pain in the left lower extremity with flexion, extension, and abduction. Dr. Jones opined that the claimant suffered from cervical radiculopathy and left hip and lower back pain and prescribed the claimant 10 milligrams of Toradol daily. (R. 322-325).

Then, on January 27, 2009, the claimant sought treatment from Dr. Michael Disney at Gadsden Regional Medical Center for lower back pain, abdominal pain, joint pain, and numbness and tingling in his upper extremities. Dr. Disney noted, "symptoms are severe and consist of paresthesias in fingers, bilaterally, thighs, with disordinate movement of legs causing staggering gait." Additionally, Dr. Disney found that the claimant had positive abdominal pain,

---

[2] The treatment records do not indicate whether Dr. McCain prescribed pain medication and contains no diagnosis.

numbness, tingling, weakness, joint pain, extremity pain, myalgias, cramps, and back pain. In his

physical examination of the claimant, Dr. Disney noted that the claimant had no jugular vein

distention in his neck; no boney tenderness or palpable adenopathy; no tenderness in the spine;

and tenderness in the left hip with decreased range of motion. CT scans of the claimant's left hip

showed "advanced osteoarthritic change involving the left hip with near complete loss of the

joint space superiorly"; "subchondral sclerosis, subchondral cyst formation, and osteophyte

formation" in the left hip; and "deformity of the humeral head which appears chronic in nature"

in the left hip that is disproportionate for the claimant's age.  (R. 311-317, 372-374).

Dr. Jamie Martin at NEO treated the claimant on February 20, 2009 for left hip pain, leg

weakness, balance problems, and numbness in the feet and hands. Dr. Martin noted the

claimant's past medical diagnosis of avascular necrosis; the car wreck in which he injured his

neck; abnormal skin sensations and sensitivity to touch from his T8 vertebrae down; difficulty

walking; numbness in his fingers; extreme hyper-reflexive lower extremities with involuntary

muscle contractions that would not stop; and decreased range of motion of his hip.[3] (R. 361).

On February 24, 2009, on referral from Dr. Ryan, Dr. Mark Sateriale, a radiologist,

performed a multiplanar, multi-sequential MRI on the claimant's cervical spine. The MRI

revealed spondylosis with multilevel disc disease; cervical kyphosis; central canal stenosis at C4-

C5 because of moderate-sized midline disc herniation with caudal extrusion, cord compression

of 4 millimeters; central canal stenosis at C5-C6 because of moderate-sized diffuse but mainly

right posterolateral disc herniation resulting in cord compression that is asymmetric, worse on

the right; disc bulges at C3-C4 and C6-C7 without significant mass effect; and foraminal

encroachment at C3-4, C4-5, and C5-6 because of uncovertebral joint hypertrophy. (R. 368-371).

---

[3] The record is unclear if Dr. Martin prescribed the claimant pain medication on this date.

The following day on February 25, 2009, Dr. Douthit discussed the results of the MRI with the claimant and noted that the claimant had large C4-5 and C5-6 disc herniations and a smaller herniation at C3-4 that produce significant right-sided impingement; had an excessive outward curvature of the spine; and had significant cord compression, myelopathy, and involuntary muscle contractions. Dr. Douthit recommended that the claimant undergo a "corpectomy of C4 and C5 with strut fusion C3 to C6," which "may need to extend him into C7" if "not able to obtain adequate decompression."[4] (R. 360).

On March 3, 2009, Dr. Ryan performed a cervical corpectomy of C4 and C5 with strut fusion C3 to C6 with the ATLANTIS plate fixation technique to decompress the claimant's spinal cord. The surgery confirmed Dr. Ryan and Dr. Douthit's original diagnosis of significant cord compression and disc herniations. On discharge, Dr. Ryan prescribed the claimant Toradol. (R. 304-307).

Six days after the claimant's cervical corpectomy, on March 9, 2009, Dr. Martin at NEO re-examined the claimant, and noted that the claimant "is doing well," "[h]is gait is much more normal," "fingers are feeling better," but he "still has a little bit of tingling in the little and ring fingers." Dr. Martin also recommended that the claimant keep wearing his cervical collar and return for a follow-up appointment in a month.[5] (R. 359).

At a follow-up at NEO, on April 13, 2009, Dr. Martin reported that the claimant "is doing well," "numbness and tingling in his fingers [are] better," but he "[is] still having some low back pain." Dr. Martin additionally noted that the claimant's x-rays showed high position of the hardware and graft. He recommended weaning the claimant out of his collar and prescribed Mobic and Flexeril for his back pain. (R. 358).

---

[4] The record is unclear if Dr. Douthit prescribed the claimant pain medication on this date.
[5] The record is unclear if the doctor prescribed the claimant pain medication on this date.

Dr. Martin again reported at the March 26, 2009 follow-up that the claimant "is doing very well" with good position of the claimant's graft despite the claimant not using his collar; recommended removing the claimant's collar; and prescribed 800 milligrams of Ibuprofen. (R. 357).

Subsequently, on June 9, 2009, the claimant returned to NEO, for thoracic back pain and paraspinal muscle spasms.  Dr. Douthit found that the claimant's x-rays were normal despite "paraspinal musculature tenderness." Dr. Douthit prescribed the claimant "a few pain pills," "some muscle relaxers," "anti-inflammatories," and home exercises. (R. 356).

Although the claimant's brief discusses medical records for March 2 and 4, 2010 and December 15, 2011 that pertain to the claimant's left hip pain, the court cannot find any medical records for the claimant for 2010 or 2011.  The next chronological record is the February 2, 2016 Function Report that the claimant completed at the Social Security Administration's request.

In that report, the claimant stated that he sometimes takes his daughter to school, picks her up from school, helps her with homework, and gets her ready for bed if she stays the night with him. He also stated that his mother often has to help him take care of his daughter. The claimant further stated that his illness affects his ability to sleep because his nerves jump, which makes sleep "real[ly] uncomfortable." Additionally, the claimant reported that his illness, injuries, or conditions do not affect his ability to take care of himself independently. The claimant stated that he does not prepare his meals because he is "really not good at it." (R. 214-216).

The claimant stated that he goes outside every day, and when he does, he either rides in a car or drives. He can also shop in stores, by phone, by mail, and by computer for clothes, shoes, and toys. The claimant also noted that he could manage money by paying bills, by counting change, by handling his savings account, and by using a checkbook or money order. His hobbies

include playing on the computer and the internet and watching sports on TV. He regularly spends time with others by playing games and watching TV. (R. 217-218).

Lastly, the claimant indicated that his illness, injuries, or condition affect his ability to lift, squat, bend, stand, reach, walk, sit, kneeling, and climb stairs. He also noted that he does not "really know how many pounds it affects [him]" from lifting, and he "really [cannot] squat for a long time, if not at all." He reported that he could not walk far before he starts to limp "real[ly] bad." The claimant stated that he could pay attention for a "very long" time. He can follow written instruction, oral instructions, and get along with authority figures "really well." He also noted that he is unbothered by stress and changes in his routine. (R. 219-220).

On March 4, 2016, the Social Security Administration requested that Dr. Celtin Robertson with MDSI Physician Services examine the claimant in connection with his application for disability benefits. Dr. Robertson's report indicates that the claimant provided his driver's license for identification; that the claimant listed "multiple joint pain" as his chief complaint; and that Dr. Robertson reviewed the claimant's records in preparing his report, including the claimant's SSA form 3368, his Gadsden Regional Medical Records for January and March 2009, and his NEO records for February and June 2009. (R. 376).

Dr. Robertson noted in his report the claimant's medical history and present illness. Specifically, Dr. Robertson noted that the claimant explained he had "multiple joint pain" for nine months following a motor vehicle accident where the claimant, a restrained passenger, was hit from the rear. Dr. Robertson additionally noted that emergency responders transported the claimant to Gadsden Regional Medical Center, where imaging showed "unremarkable" findings. Dr. Robertson noted that the claimant had numbness from the neck down; had weakness at the bilateral lower extremity that could cause the claimant to fall; had a disc herniation at the cervical neck; and underwent surgery at Gadsden Regional followed by physical therapy. In his

11

report, Dr. Robertson indicated that the claimant did not know how long it took before he could walk again; he reported his pain has persisted but has progressively worsened over the years; he has an achy, throbbing pain aggravated when he runs, bends at the waist, squats, or crosses his legs; his pain level is an eight on a ten-point scale when he triggers his pain by doing these activities; and his pain lasts a couple of minutes after sitting down.

Dr. Robertson also noted that the claimant, on a typical day, can take care of his personal needs; can get in and out of the shower; can sweep and take out the trash; does not prepare meals or do laundry for himself; watches television and listens to music; and spends time with his six-year-old daughter. (R. 376-377).

Dr. Robertson indicated in his report that the claimant walked into the exam room without assistance; got on and off the exam table; sat without acute distress; could hear and understand normal conversation; could toe-heel walk and squat; and did not use an assistive device. Dr. Robertson pointed out that the claimant's cervical range of motion was 0-50 degrees in flexion, 0-40 degrees in extension, 0-30 degrees in lateral flexion, and 0-70 degrees in rotation bilaterally; the lumbar range of motion was 0-90 degrees in flexion, 0-25 degrees in extension, 0-25 degrees in lateral flexion, and 0-30 degrees in rotation bilaterally; and his hip joint range of motion was 0-40 degrees in abduction , 0-20 degrees in adduction , 0-100 degrees in flexion, 0-30 degrees in extension, 0-40 degrees in internal rotation, and 0-50 degrees external rotation bilaterally. Dr. Robertson also found that the claimant had a 5-out-of-5 strength in upper and lower extremity muscle groups, including bilateral grip strength. (R. 378).

Additionally, Dr. Robertson opined that the claimant could grip and hold objects securely to the palm by the last three digits; could grasp and manipulate both large and small objects with the first three digits; had normal opposition in the thumb and functions; had no evidence of myotonia or grip release; had no evidence of localized tenderness, erythema, or effusion; had no

evidence of diminution of function with repetition; had no evidence of spasticity or ataxia; had normal sensation to touch and pinprick in all fingers; and had normal joint position and vibration sense. Moreover, Dr. Robertson opined that "subjective and objective findings [were] consistent" and "functional limitations [were] based on both subjective and objective findings." Dr. Robertson diagnosed the claimant with "multiple joint pain as per claimant," "osteoarthritis of the hip," and "cervical disc displacement with myelopathy." Lastly, Dr. Robertson opined that the claimant could stand, sit, lift, and walk without limitations; has no fine or gross motor skill limitations; has no postural limitations; and has no workplace environmental limitations. (R. 379).

On March 22, 2016, at the request of the Social Security Administration, Dr. Susan Neal completed an RFC assessment of the claimant by reviewing his medical records. Dr. Neal found that the claimant could occasionally lift, carry, and pull 50 pounds; could frequently lift, carry, and pull 25 pounds; could stand and walk for a total of six hours in an eight-hour workday; could perform unlimited pushing and pulling; could climb ramps and stairs without limitations; could occasionally climb ladders, ropes, and scaffolds; and could balance, stoop, kneel, crouch, and crawl without limitations. Dr. Susan Neal did not explain postural limitations or how and why the evidence supports her conclusions and did not cite specific facts upon which her conclusions were based.

Additionally, Dr. Neal found that the claimant could not bilaterally reach overhead; could perform gross manipulation or handling without limitations; could perform fine manipulation or fingering without limitations; and had no limitations in feeling with his "skin receptors." Again, Dr. Susan Neal did not explain manipulative limitations or how and why the evidence supports her conclusions, nor did she cite specific facts upon which she based her conclusions. (R. 84-93).

13

Lastly, Dr. Neal determined that the claimant could never work in extreme cold and heat environments; could never work in wet or humid environments; and could not work around concentrated exposure of vibrations and hazards. Dr. Neal did not give additional information explaining the reasons behind her conclusions of these limitations. Moreover, Dr. Neal opined that the objective medical evidence supports the determination that the claimant is "partially credible." Dr. Neal stated that the claimant's reported activities of daily living and medical treatment undermine his statements about intensity, persistence, and functional limitations of his symptoms, but she did not explain how or why.[6]  (R. 73-81, 94).

On January 2, 2017, the claimant returned to Quality of Life where certified nurse practitioner Angela Cunningham treated the claimant for hip pain and neck pain. The claimant reported left hip pain that he described as "burning, numbness, and throbbing," and radiates to his left thigh. The claimant also reported that "active movement, climbing stairs, jumping, kneeling, lifting weight, passive movement, prolonged standing, pushing, and squatting" aggravate his symptoms but rest relieves them.  The claimant reported decreased mobility; joint pain; problems sleeping; joint popping, stiffness, tenderness, and weakness. (R. 399).

At this visit, the claimant also reported sudden onset of neck pain located at "bilateral posterior neck and bilateral scapula." He described his pain as intermittent and mild with no radiation of the pain, and as "discomforting, dull, and throbbing," The claimant attributed the source of his pain to his motor vehicle accident in 2008. He reported that the pain is aggravated by driving, exertion, flexion, hyperextension, lifting, rotating, stress, and turning his head; relieved by ice and sitting; and results in decreased mobility, joint pain, muscle spasm, tenderness, and weakness. (R. 399).

---

[6] Throughout Dr. Neal's disability determination, she interchanges masculine and feminine pronouns such as "him" and "her." Additionally, she identified the claimant as "a 32-year-old female."

14

NP Cunningham performed a physical examination of the claimant and recommended that the claimant apply heat to the left hip for "30 minutes off for an hour" and prescribed 10 milligrams of Baclofen for muscle spasm and 25 milligrams of Indomethacin to reduce inflammation and stiffness. (R. 404).

On June 19, 2017, Dr. Donald Slappey with Orthopedic Surgeons treated the claimant for neck pain, low back pain, and left hip pain related to the claimant's motor vehicle accident on June 9, 2017. The claimant complained of "neck pain without radicular symptoms," "low back pain into the left leg," and "left hip pain and limited motion." On physical examination, Dr. Slappey found that the claimant's cervical spine had limited range of motion with tenderness in the paraspinal muscles; his lumbar spine had tenderness in the midline with limited range of motion; he had no radiating pain with his straight leg raise test; and his left hip had limited range of motion with pain on rotation. The x-rays "show[ed] the old cervical fusion but no new injury," "no acute changes" of the lumbar spine, and "some old changes" of the left hip. Dr. Slappey diagnosed the claimant with left hip pain, low back pain, and cervicalgia. He recommended further MRI studies of the cervical spine, lumbar spine, and left hip; recommended physical therapy and exercises; and prescribed 10 milligrams of Flexeril for muscle spasms and 500 milligrams of Naproxen for inflammation. (R. 388-391).

On June 27, 2017, on Dr. Slappey's referral, Dr. Michael Mead with Cahaba Valley Imaging performed MRI testing of the claimant's cervical spine, lumbar spine, and left hip. The MRI of his cervical spine showed moderate bilateral foraminal stenosis caused by "uncovertebral spurring" at C4-5; severe left neural foraminal stenosis caused by spurring at C5-6; disc bulging and posterior spurring with mild to moderate spinal and bilateral stenosis at C6-7; and disc bulging and posterior spurring with moderate spinal stenosis and severe bilateral foraminal stenosis because of spurring at C7-T1; and "chronic atrophic/myolomalacic change of lower

15

cervical cord."  His lumbar spine MRI showed a small left disc protrusion at T12-L1 and mild

disc bulging, spurs, and mild neural foraminal stenosis at L4-5.  The MRI of the claimant's left

hip revealed "severe degenerative joint disease"; severe joint space narrowing; "bone on bone

contact superiorly along the large femoral head"; "acetabular spurs along with acetabular fossa

remodeling"; "multiple cystic changes of femoral head"; and no evidence of avascular necrosis.

(394-396).

Upon Dr. Slappey's recommendation, the claimant attended physical therapy sessions

from June 30, 2017 until July 21, 2017.  At the initial evaluation, the claimant qualified his pain

as "the worst possible pain imaginable" in his neck and hip at a 10 out of 10. The physical

therapist Cory Fuller determined that the claimant had decreased cervical range of motion;

decreased left hip strength and range of motion; and loss of functional mobility as a result of

these impairments. However, Mr. Fuller noted that the claimant's rehabilitation potential was

"good." On the claimant's last day of physical therapy, July 21, 2017, he rated his pain as a 6 out

of 10. Additionally, the physical therapist noted that the claimant could "perform exercises

correctly with difficulty due to pain," and that his "progress towards goals is good and his

tolerance to treatment is good." The physical therapist recommended additional physical therapy

appointments, but the claimant did not return after the July 21st visit (R. 57-70).

On February 12, 2018, the claimant returned to NEO where Dr. Ryan again treated him

for hip pain and neck pain. Dr. Ryan noted upon physical examination that the claimant

reportedly "is not really having numbness or tingling anymore, it's mostly neck pain," and he

noted that the claimant "has difficulty rotating beyond about 40 degrees left or right."

Additionally, Dr. Ryan found that the claimant has "severe arthritic changes in the left hip that

have been present for many years," and "they limit his daily activity." He also noted that the

claimant has a "moderately antalgic gait but uses no assistive device"; has range of motion

16

"about 50 degrees of flexion to about 60 degrees of flexion"; sits with his leg "externally rotated approximately 15 degrees and tolerates no internal rotation beyond that"; and "tolerates about 10 degrees of external rotation beyond his resting position." Moreover, Dr. Ryan noted that the claimant's range of motion is "the result of developmental dysplasia that is symptomatic enough now that [the claimant] is asking to have it replaced." (R. 412).

Lastly, the claimant asked Dr. Ryan to complete a physical capacity form, but Dr. Ryan explained that he did not have objective answers for many of the questions. Specifically, Dr. Ryan indicated that he could only answer five questions: that limitations existed back to 12/31/2012; that he expects the claimant's condition to last 12 or more months; that the claimant's severe arthritis of the left hip secondary to developmental dysplasia causes his limitations; that the claimant currently lists no medications that cause him negative side effects; and that the claimant needs a total hip replacement on the left. (R. 413).

*The ALJ Hearing*

On March 20, 2018, the ALJ held a hearing via video conference. Before the ALJ interviewed the claimant, he asked whether the claimant objected to exhibits marked 1A through 8F. The claimant's attorney objected to Exhibit 3F, a consultative exam report by Dr. Celtin Robertson. The claimant's lawyer stated that the claimant showed up for the exam at Canterbury Family Practice in the Quality of Life facility, but the office clerk requested that the claimant pay a $25 copay and provide proof of income. His lawyer stated that the claimant left the facility to acquire the money and proof of income from his grandmother, but the claimant's grandmother did not give either, so he never saw Dr. Robertson.  (R. 32-33).

The ALJ asked the claimant who asked him for the $25. The claimant stated that the office clerk requested the money from him when he first walked in, but the claimant could not remember that person's name. The ALJ further asked the claimant what time he arrived, and he

stated that he showed up around 9:00 am or 10:00 am, but he left the office around 11:30 am to get the information. The ALJ said he thinks what happened to the claimant is "clearly an error, but I don't have any control over those statements."

The ALJ asked whether the claimant alleges that he did not receive an exam on March 4, 2016, although Dr. Robertson submitted a written report of the visit. The claimant stated that he only saw the person at the front desk that day and not a doctor. The ALJ noted this objection and stated that he would investigate these claims, but then admitted the exhibit into the record. The ALJ further noted that the weight he gives the report would depend on what he learned from the report and "the associated activities," but he would evaluate the allegation further beyond the hearing. (R. 33-34).

The claimant testified that his past relevant work included a glass cutter, caregiver, and quality control inspector.  After his car accident, the glass company laid him off in 2008 because the company considered him a fall risk.  The claimant testified that he could no longer work as a quality inspector because of the pinched nerves in his hip.  (R. 34, 35-39, 46).

He stated that his girlfriend and family help provide for him, and he sometimes lives with his girlfriend but primarily lives with his grandmother.  (R. 41-42).

The claimant testified that he has neck and hip pain; that his neck surgery helped but did not fix all of his problems; and that he needs to have surgery to replace his left hip, but he has no insurance and cannot afford the surgery.  The claimant testified that he still has problems with his hip; has "numbness" and "tingling" in his fingers that cause him to drop things; and cannot lift things or stand or sit in one spot for long because of his neck surgery and hip pain.  The claimant testified that Dr. Ryan restricted the claimant from lifting or carrying a specific weight, but he could not remember the number of pounds to which Dr. Ryan limited him.

18

He stated that anytime he walks the nerves in his hip pinch and "it's almost like I am about to fall," but he does not use any sort of assistive device to help him walk. (R. 41-43).

The claimant stated that he had to sit in a sideways position at the hearing to take the pressure off his hip. Specifically, the claimant stated, "[i]t hurts so much, I take [the] pressure and I don't have my pillow with me, usually I have a pillow but it hurts so bad that I can't just sit on it like that. I have to like try to do what's best for me and what will ease the pain on my hip." The claimant stated that he sits sideways during the day for four to five hours, with his legs up at waist level, with a pillow in-between his legs or underneath his left thigh. Additionally, the claimant stated that he could not sleep well at night because the "nerves jump in my left leg." (R. 44-46).

The claimant testified that he takes the medications at the times and the amounts prescribed to him to help with his pain and that he has received all of the recommended treatments by his medical doctors except for the hip surgery that he cannot afford.  (R. 40, 44).

Next, the ALJ posed several hypothetical questions to the vocational expert, Ms. Renee Smith. The ALJ first asked the vocational expert to consider the claimant's past relevant work history.  Ms. Smith stated that, from October through December of 2012, the claimant worked as a parts inspector, classified as light, semi-skilled work; from February 2011 through September 2012, the claimant worked as a chicken cleaner, classified as light, unskilled work; from September 2010 through February 2011, the claimant worked as a machine cleaner, classified as medium, unskilled work; from January 2007 to August 2008, the claimant worked as a glass cutter, classified as heavy, semi-skilled work; and from March 2005 through June 2006, the claimant worked as a caregiver, classified as medium, semi-skilled work. (R. 47-48).

The ALJ asked Ms. Smith to assume a hypothetical individual that is younger; has a high school education; has experience in the five jobs she previously identified; has the RFC to

perform medium exertion work; cannot climb ladders, ropes, or scaffolds; cannot perform in concentrated exposure to extreme hot or cold temperatures; cannot tolerate vibration or work hazards; can occasionally climb ramps or stairs; and can rarely, no more than 10% of the workday, kneel, but frequently stoop or crouch. (R. 49-50).

The ALJ then asked, given these limitations, whether a person could perform any of the five jobs previously identified from the work history of the claimant. Ms. Smith testified that the hypothetical individual could work as a caregiver, a machine cleaner, a parts inspector, and a chicken cleaner as "actually performed and as generally performed," but not as a glass cutter. (R. 50-51).

Then, the ALJ asked Ms. Smith to assume the same hypothetical individual but changed the RFC from a medium exertional level to a light exertional level. Ms. Smith testified that the hypothetical person could work as a parts inspector and a chicken cleaner, as "generally and actually performed," and as a "companion."[7] (R. 51).

Ms. Smith testified that the hypothetical person could also perform light, unskilled work as a marker, with greater than 800,000 jobs available nationally; light, unskilled work as a garment sorter, with greater than 100,000 jobs available nationally; and sedentary, unskilled work as a spotter, with greater than 250,000 jobs available nationally. (R. 51-52).

The ALJ then added to the hypothetical the need for the individual to change postures frequently, meaning possibly every 30 minutes, from upright standing or walking to sitting. Ms. Smith testified that the hypothetical individual could not perform medium work, and the number of light and sedentary jobs previously mentioned would reduce by 30%. (R. 52-53).

---

[7] The vocational expert said "companion," not "caregiver."

In a fourth hypothetical, the ALJ added the limitation that the hypothetical individual needed the opportunity to use a cushion or pad when seated in performing the work activities. Ms. Smith stated that this additional limitation would not change her answers to any previous hypotheticals. (R. 53).

Next, Ms. Smith testified that the need to elevate the left lower extremity no more than the footstool level would not impact her answers to the previous hypotheticals. However, if the hypothetical individual needed to elevate the lower extremity at waist height or above, not during an accommodated break, no jobs would be available. Ms. Smith stated that an individual could be off-task no more than 15% of the workday, which includes two fifteen-minute breaks and a thirty-minute lunch break. Additionally, Ms. Smith stated an individual could not miss more than two days per month on a regular and consistent basis. (R. 53-54).

Lastly, Ms. Smither testified that the Dictionary of Occupational Titles did not include some aspects of the hypotheticals. Specifically, she stated changing positions, elevating the lower extremities, breaks, and absences, are not specifically addressed in the DOT; therefore, she relied on her training, education, and experience in the field. (R. 54).

*Other Evidence Submitted After the Hearing*

After the ALJ hearing, on April 5, 2018, NP Sullivan submitted a physical capacity form on behalf of the claimant. NP Sullivan opined that the claimant could not sit upright in a standard chair for any amount of time; could stand for up to 15 minutes at one time; could not work a full 8 hours without having to lie down, sleep, or sit with legs propped at waist level or above; could not work without being off task for 75% of an 8 hour day; and could not work without missing 30 days of a 30-day period. Additionally, NP Sullivan noted that the claimant's limitations existed back to December 31, 2012 and that she expected the claimant's condition to persist for

12 or more months. Lastly, NP Sullivan noted that the claimant's severe arthritis of the left hip secondary to developmental dysplasia causes his limitations and that surgery is needed.[8] (R. 29).

### The ALJ's Decision

On May 29, 2018, the ALJ found that the claimant was not disabled under the Social Security Act. First, the ALJ determined that the claimant's earning records showed that the claimant met the insured status requirement. However, the claimant's insured status expired on March 31, 2016. Thus, the claimant had to establish a disability that occurred between December 31, 2012, through March 31, 2016. The ALJ then stated that the claimant had not engaged in substantial gainful activity since December 31, 2012. (R. 16, 18).

Next, the ALJ found that the claimant had the severe impairments of cervical degenerative disc disease, degenerative joint disease, and osteoarthritis of the left hip that significantly limit his ability to perform basic work activities. (R. 19).

The ALJ concluded that the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ found that the claimant did not meet the criteria for Listing 1.02, concerning major disfunction of a joint, because he does not have a gross anatomical deformity; does not use an assistive device for ambulation; has no chronic joint pain and stiffness with signs of limitations of motion or abnormal motion of the affected joints; has no appropriate medically acceptable imaging of joint space narrowing; has no bony destruction or ankylosis of the affected joints; and does not have the inability to ambulate effectively. (R. 19).

---

[8] The record is unclear as to how NP Sullivan arrived at her conclusions regarding the claimant's functional capacity.

Likewise, the ALJ found that the claimant's impairment does not meet the criteria of Listing 1.04 that deals with disorders of the spine because the most recent objective imaging in the claimant's record indicates no nerve root compression of the cervical spine. (R. 19).

Additionally, the ALJ determined that the claimant's impairment did not meet the requirement of any impairment in 20 CFR Part 404, Subpart P, Appendix 1, because no examining or treating medical source has reported that the claimant has an impairment that medically equals the criteria of a listed impairment. Moreover, the ALJ noted that the relevant medical evidence demonstrated by medically acceptable clinical and laboratory diagnostic techniques does not establish medical equivalency of a Listing, and no physician designated by the Agency has opined that the claimant's impairments are medically equivalent to any section of the Listing of Impairment. The ALJ concluded that the claimant does not have an impairment that meets or medically equals the criteria of any impairment per 20 CFR §§ 404.1527 and 416.927, SSR 86-8, SSR 17-2p, and Hallex 1-2-6-70(D). (R. 19, 20).

Next, the ALJ determined that the claimant has the residual functional capacity to perform light work with these additional limitations: cannot climb ladders, ropes, or scaffolds; needs a temperature-controlled work environment with no vibrations or hazards; can occasionally climb ramps or stairs; can frequently stoop or crouch; can rarely (up to ten percent of the workday) kneel or crawl; and needs to change from an upright posture to a seated posture as frequently as every thirty minutes. (R. 20).

In making this finding, the ALJ considered the claimant's symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause symptoms, the claimant's

allegations regarding the intensity, persistence, and limiting effects of these symptoms were not fully consistent with the evidence.

To support his finding, the ALJ first considered the objective medical evidence regarding the claimant's degenerative disc disease and degenerative joint disease. The ALJ noted that the claimant began seeing Dr. Ryan at NEO when the claimant experienced numbness and tingling in his upper extremities as a result of a motor vehicle accident. The ALJ noted that Dr. Ryan recommended surgery after magnetic resonance imaging (MRI) of the claimant's spine showed foraminal encroachment at C3-4, C4-5, and C5-6. Additionally, the ALJ noted that in February 2009 the claimant underwent a corpectomy with strut fusion at C3-C6. The ALJ then pointed to the fact that Dr. Ryan's postoperative notes indicated that the claimant's surgery went well and reported an improvement in numbness and tingling in the claimant's fingers.

Moreover, the ALJ noted that in June 2017 after a second motor vehicle accident[9] the claimant saw an orthopedist for complaints of pain, but imaging showed no new changes in his cervical spine. Lastly, the ALJ found that the June 2017 MRI showed moderate spinal stenosis from C7-TI and mild to moderate stenosis at C6-7. (R. 21).

Next, the ALJ considered the medical records regarding the claimant's left hip osteoarthritis. The ALJ noted the claimant first sought treatment for hip pain in 1997, when the claimant's doctor treated him with physical therapy. The ALJ then noted that the claimant returned two years later in 1999 complaining again of left hip pain; x-rays of his hip showed signs of avascular necrosis; and the claimant's physician did not restrict the claimant's activity at the time. The ALJ then noted that Dr. Ryan found in 2004 that the claimant would likely need a hip replacement later but thought it best to delay the surgery as long as possible; that the June

---

[9] The court finds no mention of a second car accident in the claimant's medical records, other than a subsequent medical report in which Dr. Donald Slappey noted that the claimant reported being in a motor vehicle accident on June 9, 2017.

2017 MRI confirmed severe osteoarthritis but no evidence of avascular necrosis; and that in February 2018 Dr. Ryan indicated the claimant needed left hip replacement surgery but he had no insurance or money to pay for the surgery. The ALJ noted that Dr. Ryan released the claimant to return when the surgery could be performed. Additionally, the ALJ acknowledged the claimant's testimony where the claimant stated he needs the surgery because he has a great deal of pain from his left hip but is unable to afford the surgery. (R. 21).

Regarding Dr. Robertson's consultative examination of the claimant in 2016, the ALJ noted the claimant's testimony that he left the office before Dr. Robertson examined him. In disregarding the claimant's allegations that Dr. Robertson never examined him, the ALJ pointed out that the claimant could not produce evidence to prove Dr. Robertson did not examine him and could not remember the name of the front-desk clerk; that Dr. Robertson's evaluation notes identified the claimant by his driver's license; and that Dr. Robertson's notes indicated that the claimant complained of multiple joint pain. The ALJ noted that Dr. Robertson's notes also indicated that the claimant could walk without assistance; could get on and off the table easily; could sit without acute distress; could toe-heel walk, squat, and rise without a problem; had 5/5 strength on examination in the bilateral upper and lower extremities; and could grip and hold objects during the evaluation. Lastly, the ALJ noted that Dr. Robertson diagnosed the claimant with multiple joint pain, osteoarthritis of the hip, and cervical disc displacement but opined that the claimant had no limitations. So, the ALJ found that Dr. Robertson in fact saw the claimant for the evaluation and thus considered his report. (R. 21-22).

The ALJ further considered the claimant's residual functional capacity in light of other factors such as the type, dosage, effectiveness, and adverse side effects of any medications, as well as whether the claimant receives any treatment other than medications. The ALJ noted that the claimant does not take any medications for his impairments but uses over the counter pain

relievers. Additionally, the ALJ noted that the claimant did not allege any side effects. Furthermore, the ALJ noted the claimant's reported use of a pillow when sitting because he cannot sit for an extended period and addressed this need by imposing the postural limitations within the claimant's residual functional capacity. (R. 22).

The ALJ considered the claimant's daily activities, other functional limitations, and restrictions because of pain or other symptoms and concluded that the claimant's residual functional capacity is consistent with a range of light work because the claimant can independently groom and take care of himself; can take care of his younger daughter when she stays with him; can drive a car; can shop as needed; can manage money; and can do household chores like sweep, take out the trash, and clean. (R. 22).

The ALJ gave Dr. Robertson's opinion that the claimant has no limitations "good but not conclusive weight" because of Dr. Robertson based his findings on a single examination without the benefit of the claimant's entire record after 2016. Moreover, the ALJ found that the claimant's imaging records show that the claimant has some limitations of function. (R. 22).

The ALJ then considered the opinion evidence of Caroline Sullivan, a nurse practitioner who submitted a one-page form after the hearing in April 2018. The ALJ found that Ms. Sullivan provided no supporting documentation for her findings and was an unacceptable medical source.[10] Accordingly, the ALJ gave little weight to Ms. Sullivan's conclusions. (R. 22).

The ALJ concluded that the claimant's residual functional capacity was consistent with the objective imaging of record, treating records, and Dr. Robertson's findings. As such, the ALJ noted that nothing in the record precludes the claimant from performing work at the light level of exertion with the additional restrictions imposed. (R. 22).

---

[10]  For claims filed on or after March 27, 2017, nurse practitioners are now considered "acceptable medical sources." *See* POMS DI 22505.003.

Finally, the ALJ found that the claimant could not generally or actually perform his past relevant work as a caregiver or glass cutter because both jobs require a medium level of exertion. Additionally, the ALJ determined that, based on the claimant's age, education, work experience, residual functional capacity, and vocational expert's testimony, jobs existed in significant numbers in the national economy that the claimant could perform, including jobs such as marker, garment sorter, and spotter.[11] As such, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 23-24).

## VI. DISCUSSION

The claimant argues that substantial evidence does not support the ALJ's determinations regarding his allegations of intensity, persistence, and limiting effects of his left hip pain. This court agrees.

The ALJ correctly recounted some of the facts in the record regarding the claimant's left hip pain, including that the 2017 MRI showed that the claimant has severe osteoarthritis; that the claimant's treating physician Dr. Ryan indicated in February 2018 that the claimant needs left hip replacement surgery; and that the claimant has no insurance and cannot afford the surgery. But missing from the ALJ's opinion are adequate explanations supported by substantial evidence as to how the claimant's allegations regarding the intensity, persistence, and limiting effects of his left hip pain are inconsistent with the medical record. *See Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987) (noting that substantial evidence must support the ALJ's findings regarding the limiting effects of the claimant's symptoms).

---

[11] Per the Dictionary of Occupational Titles, a spotter, also known as a table worker, examines square tiles of felt-based linoleum material passing along on a conveyor and replaces missing and substandard titles. *See* e.g. https://occupationalinfo.org/73/739687182.html.

The record is clear that the claimant has complained of left hip pain since 1997, and that his pain has worsened over the years.  In October 1999, Dr. Ryan noted evidence of avascular necrosis and osteoarthritis in the claimant's left hip, and by 2001, the claimant's x-rays showed further advancement of avascular necrosis disease in his left hip "probably secondary to delayed Perthes disease as a child."  Dr. Douthit noted in 2001 that the claimant's symptoms *would not improve*, and he would need a hip replacement in the future.  In 2003, Dr. Ryan noted no further advancement of his avascular necrosis disease but indicated joint space narrowing in the claimant's left hip. Dr. Ryan recommended treating the claimant conservatively *for as long as possible*.

By 2009, CT scans of the claimant's left hip showed "advanced osteoarthritic change involving the left hip with near complete loss of joint space" and "deformity of the humeral head which appears chronic in nature."  The June 2017 MRI of the claimant's left hip showed "severe degenerative joint disease"; severe joint space narrowing; "bone on bone contact superiorly along the large femoral head"; and spurs.  Dr. Ryan noted in February 2018 that the claimant has "severe arthritic changes in the left hip that have been present for many years;" that those changes "limit his daily activity"; that the claimant's limitations caused by his severe arthritis existed back to December 31, 2012; and that the claimant needs a total left hip replacement.

The ALJ agreed that the objective medical evidence "could reasonably be expected to cause some symptoms and functional limitations," but he found that the claimant's allegations about the intensity and limiting effects of his hip pain are "not entirely consistent" with the medical evidence.  But the objective medical evidence showing that the claimant has *severe* joint space narrowing and "*bone on bone contact* superiorly along the large femoral head" in his left hip supports the claimant's allegations regarding the severity of and limitations caused by his hip pain.

28

"When cartilage wears away completely [in the hip], the cushioning buffer that it provides disappears, allowing for bone-on-bone contact" that can "cause intense pain and other symptoms." [12]  Severe osteoarthritis in the hip can cause increased pain both during activities and when at rest and decreased range of motion, "making it harder to enjoy day-to-day activities."[13] The claimant noted in his function report that activity, walking, sitting, prolonged standing, pushing, lifting weight, and squatting aggravate his hip pain. He also testified at the hearing that resting in a certain position throughout the day helps his hip pain and that he sits on his side four to five hours during the day, with his legs up at waist level, with a pillow in between his legs or underneath his left thigh to attempt to alleviate his hip pain.

As osteoarthritis progresses from moderate to severe, "pain is usually more persistent and constant"[14]  and elevation of the legs can help alleviate pain associated with osteoarthritis in the hip. [15]  But the ALJ did not mention in his opinion the claimant's specific limitation regarding his need to sit on his side four to five hours during the day with his legs *at waist level*.  The vocation expert testified that no jobs would be available for the claimant if he needed to elevate his legs at waist level during the day.  But the ALJ failed to explain *why or how* the claimant's alleged need to elevate his leg to waist level to alleviate his pain would be *inconsistent* with the objective medical evidence showing severe osteoarthritis and bone-on-bone contact in his left hip.

The ALJ mentions that the claimant testified that he is in a great deal of pain in his left hip and cannot afford the left hip replacement surgery. But the ALJ fails to discuss anywhere in his opinion how the claimant's inability to afford the surgery affects the claimant's ability to

---

[12]  *See* https://www.healthline.com/health/osteoarthritis#osteoarthritis-and-cartilage.
[13]  *See id.*
[14]  *See* https://www.verywellhealth.com/osteoarthritis-symptoms-4014403.
[15]  *See* https://www.medicalnewstoday.com/articles/front-hip-pain#treatments.

pursue the only treatment option recommended at this point by his doctors to help alleviate his pain. And the claimant's failure to have the hip surgery does not prevent him from receiving disability benefits where his noncompliance with his doctor's recommendation is a result of his inability to afford the surgery. *See Bellew v. Comm'r of Soc. Sec.*, 605 F. App'x 917, 921 (11th Cir. 2015) (citing *Dawkins v. Bowen*, 848 F.2d 1211, 1212-14 (11th Cir. 1988)) ("[N]oncompliance does not prevent a claimant from receiving benefits where the noncompliance is the result of the claimant's inability to afford treatment.") The bottom line is that the claimant needs left hip replacement surgery; objective medical evidence supports his allegations about the severity of his left hip pain; his treating physician acknowledges that the claimant's left hip pain limits his activity; but the claimant cannot alleviate the severity of that pain because he cannot afford the surgery.

The ALJ noted that at the time of his decision the claimant only used over-the-counter pain relievers for his pain. The court notes that his doctors in the past have prescribed the narcotic pain medication Toradol, anti-inflammatory medications like Celebrex and Naproxen, and muscle relaxers to help alleviate his pain. And that the record is unclear whether doctors prescribed pain medications during certain visits, and whether the claimant's lack of medical treatment from 2012 through 2016 was the result of the claimant not working and having no insurance. But the claimant taking over-the-counter pain relievers is only one factor for the ALJ to consider; it does not negate the severity of the claimant's left hip pain or the fact that the only treatment at this juncture recommended by his doctors is hip replacement surgery that the claimant cannot afford.

The ALJ also considered the claimant's daily activities to discredit the claimant's allegations regarding the severity and limiting effects of his hip pain. The ALJ noted that the claimant "is independent in his personal care and grooming, takes care of his young daughter

when she stays with him, can drive a car, and can do shopping as needed," and can "do household chores like sweeping, taking out the trash, and cleaning."  But the claimant's ability to do these limited activities for short periods of time does not negate his allegation of severe hip pain and does not support the ALJ's finding that the claimant can work a full-time job for forty hours a week. He does not have to be "bedridden" to be disabled, and his ability to do simple, everyday activities for short periods of time in limited ways does not negate that he has debilitating hip pain for which he needs surgery. *See Bennett v. Barnhart*, 288 F. Supp. 2d 1246, 1252 (N.D. Ala. 2003) ("[It is not] necessary for a plaintiff's pain to render her bedridden in order for her to be disabled…It is the ability to engage in gainful employment that is the key, not whether a plaintiff can perform minor household chores or drive short distances."); *see also Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997) (finding that participation in everyday activities of short duration, such as housework or fishing, does not disqualify a claimant from disability).

The ALJ also relied on Dr. Robertson's finding that the claimant has "no limitations" to support finding that the claimant's allegations of the intensity of his pain is not consistent with the medical evidence.  However, as the ALJ acknowledged, the claimant's medical record does not support a finding of "no limitations," and the ALJ agreed that the claimant was more limited than Dr. Robertson opined.

And the court has concerns about the ALJ admitting Dr. Robertson's opinion as an exhibit in the record over the claimant's objection that Dr. Robertson never actually physically examined him.  The ALJ admitted the report into evidence but stated that the weight he gave the report would depend on further investigation of the report's contents and "the associated activities," and that he would evaluate the claimant's allegation further beyond the hearing.  But, based on the ALJ's opinion, he only read Dr. Robertson's opinion and concluded that Dr.

Robertson personally evaluated the claimant based on the specific language in that opinion indicating information came from the claimant.  The court can find no mention in the ALJ's decision that the ALJ inquired into the facts and circumstances alleged by the claimant beyond reading the doctor's opinion.

In fact, the ALJ stopped short of investigating and concluded that, because the claimant's driver's license had identified the claimant and he was unable to remember the desk clerk's name or produce additional evidence, Dr. Robertson's opinion was reliable.  But the front desk clerk could have been the only person to have identified the claimant by his driver's license, which makes logical sense because administrators and front desk clerks at medical offices are often the ones to identify patients before doctors evaluate them.  In this case, the claimant's allegation that he never made it past the front desk clerk may be accurate if he gave the front desk clerk his driver's license as identification.

Moreover, the claimant's inability to produce further evidence or remember the name of an absolute stranger two years later seems unfair. After all, the ALJ has the duty to investigate and inquire into all the relevant facts—not the claimant.  Before deciding that the claimant is not disabled, the ALJ has the responsibility to develop the claimant's complete medical history for at least the 12 months preceding the month in which the claimant files for disability. 20 C.F.R. § 404.1512(b)(1). Underlying this duty is also the ALJ's duty to develop a full and fair record even if the claimant is represented by counsel. *Cowart v. Schweiker*, 622 F.2d 731, 735 (11th Cir. 1981); *see also* 29 CFR § 458.76 (the ALJ has the duty to inquire fully into the relevant facts as they relate to the matter).

This duty is a burdensome task, which requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Id*.  The ALJ must be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are

elicited." *Id.* (quoting *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978)). Moreover, when conflicting evidence exists, the ALJ must use every reasonable effort to resolve the conflict. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971).

The ALJ indicated he would investigate the issue beyond the hearing.  The court does not find that Dr. Robertson's opinion is in fact unreliable, but the ALJ's action of simply reading Dr. Robertson's opinion, without any further action to verify the reliability of his opinion and whether he actually examined the claimant, seemingly falls short of "scrupulously and conscientiously" exploring all relevant facts before making his determination. *See Cowart*, 622 F.2d at 735.

Because the ALJ failed to adequately explain how or why the claimant's allegations regarding the intensity, persistence, and limiting effects of his left hip pain are inconsistent with the medical record, the court finds that substantial evidence does not support the ALJ's determinations on this issue.

## VII: CONCLUSION

For the reasons stated above, this court concludes that the decision of the Commissioner should be REVERSED and REMANDED for action consistent with this opinion.

The court will enter a separate Order in accordance with the Memorandum Opinion.

**DONE** and **ORDERED** this 21ˢᵗ day of October, 2020.

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE